6 F.3d 788
NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
 TECHNOLOGY FOR ENERGY CORPORATION, Plaintiff/Cross-Appellant,
v.
COMPUTATIONAL SYSTEMS, INC., Defendant-Appellant
and
Ronald G. CANADA, Defendant.
 Nos. 92-1542, 92-1551.
 United States Court of Appeals, Federal Circuit.
 Sept. 21, 1993.
 
 Before RICH, RADER, and SCHALL, Circuit Judges.
 RICH, Circuit Judge.
 
 DECISION
 
 1
 Plaintiff, Technology For Energy Corporation (TEC), filed this patent infringement suit against defendants, Computational Systems, Inc. (CSI) and Ronald G. Canada, alleging infringement of U.S. Patent No. 4,520,674 ('674 patent), entitled "Vibration Monitoring Device", in the United States District Court for the Eastern District of Tennessee. CSI appeals from the district court's August 7, 1992 judgment entered on a jury verdict of infringement under the doctrine of equivalents and denying CSI's motion for judgment as a matter of law (JMOL) or for a new trial. TEC cross-appeals from the district court's January 24, 1991 summary judgment on the issue of laches. We affirm.
 
 DISCUSSION
 I.
 
 2
 The '674 patent claims a vibration monitoring device (VMD). VMDs are used to detect potential breakdowns of machinery by measuring and analyzing the vibrational frequencies produced by the machinery while it is in operation. The vibrations are converted into an analog electrical signal and then converted by the VMD into data which can be used to identify problems in the machinery. Claim 1 of the '674 patent reads as follows:
 
 
 3
 1. A portable vibration monitoring device for use in connection with a base computer which stores data regarding the nature and parameters of vibration measurements to be made on preselected machines by such device, said device comprising:
 
 
 4
 power supply means;
 
 
 5
 a vibration sensor which produces an analog signal representative of selected vibration of said machine upon mechanically connecting said sensor with said machine at preselected measurement points thereon;
 
 
 6
 signal conditioning means for conditioning said analog signal generated by said vibration sensor, said signal conditioning means including anti-aliasing means for filtering preselected frequencies from said signal generated by said sensor to enhance the accuracy of the data collected;
 
 
 7
 means connected with the output of said signal conditioning means including multiple modules which are selectively energized, one of said modules comprising high speed math processor means;
 
 
 8
 processing means for selectively energizing said modules for purposes of reducing power consumption, for loading and retrieving information and instructions, and for selectively employing said anti-aliasing means for analysing [sic] digital information concerning vibration data stored in said device and for selectively interfacing with an operator by causing information to be displayed, and for controlling the various operational modes of said device;
 
 
 9
 means operably connected to said processing means for entering and loading instructions and information for controlling the operation of said device;
 
 
 10
 first memory means for storing operating instructions for use by said processing means; and
 
 
 11
 further memory means for storing data collected by said device from preselected locations upon said machines. [Emphasis ours.]
 
 
 12
 CSI manufactures three different VMD models which, for purposes of this appeal, are deemed by CSI to be the same. TEC alleged, and the jury found, that CSI's VMDs infringe claim 1 under the doctrine of equivalents. CSI moved for JMOL on the grounds that the evidence was not sufficient to support the finding of infringement under the doctrine of equivalents and, in the alternative, for a new trial. The district court denied both of CSI's motions. This appeal followed.
 
 
 13
 On appeal of a judgment entered on a verdict after denial of a motion for JMOL, the appellant
 
 
 14
 must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied from the jury's verdict cannot in law be supported by those findings. [Citations omitted.]
 
 
 15
 Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893, 221 USPQ 669, 673 (Fed.Cir.), cert. denied, 469 U.S. 857 (1984). Fact findings reviewed under the substantial evidence standard must be affirmed unless appellant shows that no reasonable juror could have reached such a result. Id.
 
 
 16
 In order to prove infringement under the doctrine of equivalents, a patentee must show that the accused device performs substantially the same function in substantially the same way to achieve the same result as the claimed device. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 856, (85 USPQ 328, 330) (1950). The issues of infringement and of equivalency are issues of fact. Malta v. Schulmerich Carillons, Inc., 952 F.2d 1320, 1325, 21 USPQ2d 1161, 1165 (Fed.Cir.1991), cert. denied, 112 S.Ct. 2942 (1992).
 
 
 17
 CSI argues that the jury's verdict of infringement under the doctrine of equivalents is not supported by substantial evidence and that TEC failed to proffer evidence and linking argument to establish either that: 1) all three prongs of the Graver Tank test were met; or 2) the claimed limitations in dispute were met equivalently. CSI identifies three claim limitations which it alleges TEC failed to establish are present in the accused devices: (1) the selectively energized high speed math processor means; (2) the selectively energized multiple modules; and (3) selectively employing the anti-aliasing means.
 
 
 18
 The district court found that there is substantial evidence to support the jury's finding of infringement. A thorough analysis of the supporting evidence is provided in the district court's opinion. Based on our review of the record, we are also convinced that there is sufficient evidence to support the jury's infringement finding.
 
 
 19
 Generally, much of the supporting evidence upon which the jury could have relied was provided by Mr. Raymond Adams, testifying as one skilled in the art, and Mr. Eugene Zimmer, testifying as an expert. Together they identified each limitation in the claims of the '674 patent and showed the jury how the claims read on the accused devices. To aid in this comparison, Mr. Adams physically secured different colored ribbons next to each limitation on a claim chart and a matching ribbon to the corresponding element or its substituted equivalent on a circuit diagram of the accused device. As he identified the physical structures, Mr. Adams explained how and why each limitation was met, either literally or equivalently, by the accused device. Mr. Zimmer then followed up with additional testimony to support and build on what was said by Mr. Adams.
 
 
 20
 Specifically, the district court found that there was substantial evidence on which a reasonable jury could have concluded either that the accused devices incorporated equivalent structure to perform the identical high speed math processing function, or that the accused device included the substantial equivalent of a "high speed math processor means" to support a finding of infringement under the doctrine of equivalent. CSI has failed to convince us otherwise. Mr. Adams testified, for example, that the accused CSI Model 2110DSP incorporates a separate DSP chip which, in cooperation with the software and microprocessor of the device, accomplishes the high speed math processing necessary for Fourier analysis. He explained that CSI had merely substituted a faster processor chip to accomplish what used to take two chips to accomplish.
 
 
 21
 Mr. Adams provided extensive testimony explaining the function and result of the "high speed processor means." For example, he testified:
 
 
 22
 Q. Would you explain to the jury what the high speed math processor means does?
 
 
 23
 A. Well, I mentioned that to do such a sophisticated calculation as the Frenchman, Fourier, invented, it used to take a lot of calculation power, a lot of computing power and used pretty big computers to do that. Now it can be done obviously in a device about an inch or so square ... So that the operation for doing the Fourier transforming from the time domain to the frequency domain that is a mathematical operation involving a lot of mathematics. If it is to be done quickly so the operator can go so to the next station it has to involve a lot of high speed math processing and so this device is capable of mathematics, add, subtract, multiply and divide in order to do that and it has to do it at very high speed.
 
 
 24
 He then went on to describe the way the high speed math processing was accomplished in the accused devices. For example, he testified:
 
 
 25
 A. The microprocessor in this case both with the 2100 and the 2110 device has the multiply instruction which is one of the key instructions in addition to add and subtract. This microprocessor chip, this circuit has the multiply instruction which when used with the computer program will constitute the high speed math processing possibility, the high speed math processing means.
 
 
 26
 Mr. Adams also explained why the means through which the accused devices accomplish high speed math processing are the substantial equivalent of the "high speed math processor means" in the claim. For example, he testified:
 
 
 27
 A. ... If you change the computing algorithm to use the fixed point arithmetic and go up to the clock speed, you can do that high speed operation in the one microprocessor chip.[1]
 
 
 28
 Q. Would that type of interchangeability be something that one skilled in the art would understand?
 
 
 29
 A. Well, yes. As a matter of fact, I have another exhibit that I prepared which kind of shows that ...
 
 
 30
 * * *
 
 
 31
 * * *
 
 
 32
 Now, Mr. Pitts asked me if an engineer experienced in the art would know to go to a single processor and the answer is, yes, given this understanding of the history and the fact that things are always increasing and that a single chip will come available that can take the place of two chips, if not now very shortly an engineer indeed experienced in this art would know to do that. That is exhibit 693.
 
 
 33
 Mr. Zimmer also provided testimony to support this finding. However, we find it unnecessary to cite to this testimony since it is provided in the district court's opinion and in TEC's brief.
 
 
 34
 The district court also found that there was substantial evidence on which a reasonable jury could have concluded that the accused devices incorporate "means connected with the output of said signal conditioning means including multiple modules which are selectively energized", or the equivalent thereof, and that one of the selectively energized modules of the accused devices comprises "high speed math processor means" or the equivalent thereof.
 
 
 35
 Mr. Adams and Mr. Zimmer testified in great detail as to how selective energization of relevant modules is accomplished in both the patented and accused devices, and why the accused devices are deemed to accomplish the identical or equivalent function, in an equivalent way, to obtain the identical or an equivalent result, i.e., to conserve power. For example, Mr. Adams testified:
 
 
 36
 Q. Which modules are powered up? I believe you mentioned the back light and A to D converter and the math processor. Is there anything else?
 
 
 37
 A. Those are the principal things that are powered up. In the case of the math processing operation, the powering up is handled in somewhat different way in that it is not the math processing is not electrically turned on in the same way in the case of the math processing which is done in the 2110 within this microprocessor chip per say [sic].
 
 
 38
 That powering up, that enabling of the math processing operation is done through what we call the, through the software calling on the mathematical operations to be done.
 
 
 39
 * * *
 
 
 40
 * * *
 
 
 41
 Q. Is the high speed math processing done at all times?
 
 
 42
 A. No, the high speed math processing is selectively enabled by means of the computer program. The software calls upon the high speed math processing whenever high speed math processing is determined to be needed in the operation. For example, in the WINDOW operation, the WINDOW subroutine, the FFT module which does the Fourier analysis, whenever those operations that require high speed math processing are needed, the software knows that and it enables the high speed math operation.
 
 
 43
 In addition, Mr. Adams performed tests which showed that there was an increase in the level of power consumption when the Fourier calculations were called upon.
 
 
 44
 Finally, the district court found that there was substantial evidence on which a reasonable juror could have concluded that the accused devices incorporate a "processing means for ... selectively employing said anti-aliasing means." In general, the anti-aliasing means is required to filter out pre-selected frequencies generated by the sensor to allow the Fourier transfer to generate reliable data. The '674 patent teaches that the anti-aliasing means is selectively employed by providing various signal paths between an output of the amplifier and a multiplexer, one of these paths being through the anti-aliasing filter. The path is selected by the microprocessor which also sets the cutoff or corner frequency of the filter, i.e., tunes or digitally controls the filter.
 
 
 45
 In the accused devices the microprocessor sets the corner frequency of the filter, but does not bypass the anti-aliasing filter by selecting a separate path when filtering is not desired. Instead the microprocessor tunes the anti-aliasing filter (sets the corner frequency) to such a high frequency that the filter ceases to have an effect on operatively relevant frequencies of the signal, i.e., it ceases to function as an anti-aliasing filter. There was substantial evidence that this microprocessor-controlled-tuning of the anti-aliasing filters of the accused devices constituted "selectively employing the anti-aliasing means."
 
 
 46
 Mr. Adams testified at great length as to what was taught by the '674 patent with regard to selectively employing the anti-aliasing means, how that was accomplished in the accused devices, and why the accused devices incorporate the equivalent processing means. For example, Mr. Adams testified:
 
 
 47
 ... The essence of the anti-aliasing filter is that it must be tunable. It's frequency must be adjustable. That is the way it's employed. It's employed for higher frequencies or lower frequencies depending on the setting of the cutoff frequency ...
 
 
 48
 * * *
 
 
 49
 * * *
 
 
 50
 Q. Could you explain to the jury what a corner frequency is?
 
 
 51
 A. Yes. This that I have called a cutoff frequency is often taken as the corner frequency....
 
 
 52
 Q. Why is it important that that corner frequency be selected?
 
 
 53
 A. Well, if the corner frequency is not selected properly, for example, if we had intended to eliminate all of these components in this part of the vibration signal and we didn't set the corner frequency back this way far enough, and we left some of that signal unfiltered, that would contaminate, that would alias the data and so that is important in the analysis. Those aliased signals come back sort of to haunt one in terms of the way the Fourier transform is done.
 
 
 54
 Q. Is that notion described and taught in the patent? That is, the knowing of adjusting the corner frequency?
 
 
 55
 A. Yes, sir, it is.
 
 
 56
 Q. Did you find that notion in the three devices that you reviewed?
 
 
 57
 A. Yes, I do find that ... I made extensive tests on that over a two day period.
 
 
 58
 Q. What did you find?
 
 
 59
 A. I found indeed in these accused devices that corner frequency or the cutoff frequency, whatever you want to call it, is indeed tuned according to the setting of the top frequency on the analyzer and it is controlled by the microprocessor, controlled by the computer.
 
 
 60
 * * *
 
 
 61
 * * *
 
 
 62
 THE COURT: Let me ask you a question, if I might. Selectively employing the anti-aliasing filter means, as a practical matter, that has to do with that cutoff frequency going up and down, right?
 
 
 63
 A. Yes.
 
 
 64
 THE COURT: Back and forth. It's not a matter of being on and off. Its a matter of the position of cutoff. So selectively--
 
 
 65
 A. Selectively employing is the phrase that is there in the patent relative to the anti-aliasing.
 
 
 66
 THE COURT: It doesn't mean on and off. It means the position of the cutoff frequency?
 
 
 67
 A. That is correct. That is the only thing that makes sense in terms of talking about filters is that frequency at which the device operates or cuts off.
 
 Mr. Adams also testified as follows:
 
 68
 Q. What is the basis for your opinion that changing that cutoff frequency is the equivalent or the same function as selectively employing the cutoff frequency?
 
 
 69
 A. As I testified earlier, the very essence of applying a filter is to apply it with regard to the cutoff frequency with regard to the frequencies over which it operates. So to my thinking, the digital control of the anti-aliasing filter and the fact that the computer changes that band pass or changes the cutoff frequency under computer control, that is the essence that we are talking about in selectively employing the filter.
 
 
 70
 Now, I don't recall whether I said this in exactly this way, but when the anti-aliasing filter is set to its widest possible band width, it's just as if there's a direct connection through it ...
 
 
 71
 Finally, Mr. Zimmer testified that the selective employment of the anti-aliasing filter could be accomplished either by switching filters through a multiplexer, as shown in the preferred embodiment, or, as done in the CSI devices, by changing the band width.
 
 
 72
 In view of the evidence of record, we reject CSI's argument that TEC failed to present evidence and linking argument "especially as to [the] 'way' " prong of the Graver Tank test. The "substantially the same way" prong may be met if an equivalent of a recited limitation has been substituted in the accused device. Malta, 952 F.2d at 1325, 21 USPQ2d at 1165. Ample testimony was provided by Mr. Adams and Mr. Zimmer to provide a reasonable basis on which a reasonable juror could find that every limitation of claim 1 can be found either literally or under the doctrine of equivalents in the accused device.
 
 
 73
 We have examined all of CSI's arguments on appeal including its arguments that there is no evidence of copying and that the range of equivalents asserted by TEC is not patentable over the prior art. These arguments were addressed by the district court and rejected accordingly. CSI has failed to convince us that the district court's findings are clearly erroneous. Accordingly, we affirm the district court's denial of CSI's motion for JMOL or a new trial.
 
 II.
 
 74
 A determination of laches is reviewed by this court under the abuse of discretion standard. A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020, 1028, 22 USPQ2d 1321, 1325 (Fed.Cir.1992) (in banc ). However, this court may set aside such a discretionary decision if it rests on an erroneous interpretation of the law or on erroneous factual underpinnings. Id.
 
 
 75
 When a determination of laches is made on summary judgment there must, in addition, be no genuine issues of material fact, and all pertinent factors must be considered. Id. This court reviews the district court's summary judgment de novo. Meyers v. Asics Corp., 974 F.2d 1304, 1306, 24 USPQ2d 1036, 1037.
 
 
 76
 To establish laches, a defendant must prove that:
 
 
 77
 (1) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant: and
 
 
 78
 (2) the delay operated to the prejudice or injury of the defendant.
 
 
 79
 A.C. Aukerman., 960 F.2d at 1032, 22 USPQ2d at 1328.
 
 
 80
 The district court found that TEC knew or in the exercise of reasonable diligence should have known of CSI's alleged infringing activity in May of 1986. TEC raises a number of issues on appeal. TEC argues that the trial court's determination of the beginning of the laches period rests on an erroneous factual underpinning. Specifically, TEC argues that the court's statement that "... TEC's product manager for its analyzer read all of CSI's advertising literature and observed the meter in operation at trade shows in May, 1986 ..." is not supported by the record because the product manager never said he had viewed the meter in operation in May of 1986. He merely testified that he had viewed the device in 1986. However, this one potentially erroneous factual statement is insufficient, in view of the many undisputed facts relied on by the trial court, to justify a reversal of the district court's judgment.[2] Furthermore, the court's statement is apparently a paraphrase of the court's earlier finding that Mr. Mobley testified "that he read CSI's vibration meter literature as soon as the meter was on the market and that he observed the analyzer at trade shows and in the field at factories of customers or potential customers." Finally, even if the statement is erroneous, we find it to be harmless error in light of the other evidence of record such as the statement by TEC's President that "Once CSI's meter was on the market, TEC monitored all the available information regarding the meter and its claimed performance capabilities."
 
 
 81
 TEC also argues that the district court erred in failing to consider TEC's alleged lack of funds. However, the district court specifically found that TEC failed to raise this issue: "TEC has made no claim that it lacked the means to finance this litigation." Nor does the testimony TEC cites to in its brief raise the issue of whether TEC had sufficient funds to finance the litigation. The testimony emphasized that it would have been a bad business decision to sue CSI and that all resources were better spent on rebuilding the company. There is no statement that TEC could not finance the litigation. Nor can we infer from the testimony that financing the litigation would have prevented TEC from rebuilding itself, albeit at a slower rate. Having failed to raise this issue below, TEC is barred from raising it on appeal. Braun Inc. v. Dynamics Corp. of America, 975 F.2d 815, 821, 24 USPQ2d 1121, 1126 (Fed.Cir.1992).
 
 
 82
 Material prejudice to CSI resulting from TEC's delay is essential to the laches defense. Such prejudice may be either economic or evidentiary. See A.C. Aukerman, 960 F.2d at 1033, 22 USPQ2d at 1328. Here, the district court found that CSI was economically prejudiced. TEC argues that the district court's finding is erroneous because CSI failed to establish that a nexus exists between the prejudice suffered by CSI and TEC's delay in filing suit.
 
 
 83
 Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit. Id. The district court relied on several pages of undisputed evidence showing that CSI expended considerable capital to expand its business in terms of, among other things, employees, sales, and investment in research and development during TEC's period of delay, June 1986 to March 1989. In addition, CSI was concerned enough about the '674 patent and TEC's allegations of infringement that CSI obtained and forwarded to TEC an infringement opinion dated June 5, 1986, stating unequivocally that CSI's meter did not infringe. Had TEC filed suit or, at a minimum, obtained its own infringement opinion, it might have a better argument here that the prejudice to CSI did not result from TEC's delay. After examining CSI's growth from June 1986 to March 1989, we are convinced that there is a sufficient nexus between the prejudice to CSI and TEC's delay in filing suit.
 
 
 84
 We have examined all of TEC's arguments on appeal. However, we are not convinced that the district court erred in granting summary judgment on the issue of laches. Accordingly, the judgment is affirmed.
 
 
 
 [1]
 CSI argues that the accused devices do not incorporate a "high speed math processor means" because the microprocessors of the accused devices use fixed point arithmetic to do the Fast Fourier transform calculations, rather than the floating point arithmetic described in the '674 patent. However, CSI's expert witness testified that whether to use fixed or floating point calculations is simply a design choice for one skilled in the art
 
 
 [2]
 For example, the district court also stated:
 In light of the fact that key TEC personnel were concerned as early as March, 1986, that CSI's meter infringed TEC's patent; that TEC harbored reasonable doubts as to the accuracy of Mr. Canada's infringement denial in March, 1986; ...; and that TEC's Executive Vice President of Engineering believed in May, 1986, that CSI's meter infringed TEC's patent, I find that TEC was aware of facts that would put a man of ordinary intelligence on inquiry in May, 1986, at the latest, ... and that by this time TEC knew or in the exercise of reasonable diligence should have known of CSI's alleged infringing activity, ..."